UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIRST BAPTIST CHURCH IN NEWTON,<br>*Plaintiff*<br><br>v.<br><br>CHURCH MUTUAL INSURANCE COMPANY,<br>*Defendant* | C.A. No.: 1:23-cv-10436-BEM |

### DEFENDANT CHURCH MUTUAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The dispositive issue in this property damage insurance coverage case is whether the physical damage that was incurred by the First Baptist Church in Newton ["First Baptist"] was caused by a "collapse", as that term is explicitly defined in the policy of insurance ["the Policy"] issued to First Baptist by its insurer, Church Mutual Insurance Company ["Church Mutual"]. By the plain meaning of the Policy's language, as applied to the undisputed facts of the property damage at issue here, no "collapse" has occurred. As there is no other basis claimed for coverage under the Policy, Church Mutual is entitled to a judgment of non-coverage in its favor.

### SUMMARY OF UNDISPUTED FACTS

The property damage that is the subject of this insurance coverage case occurred at First Baptist on or about April 11, 2021. The factual particulars of that incident are essentially uncontested. First Baptist is an imposing Richardsonian Romanesque stone structure that was constructed in 1888, and is listed in the National Register of Historic Places. It was built using 19th century construction methods and materials, primarily granite and brown sandstone. *See* Statement of Agreed Facts ["SOAF"] ¶¶ 1, 2, and Exs. 1 and 2. A prominent architectural feature of the church is a 90-foot tall stone bell tower, attached to the main church sanctuary, at the

1

northeast corner of the structure, that houses a bell carillon at the top of the tower and is open to the elements in the upper reaches of the tower. *Id.*, ¶ 3, Ex. 3.  As the bell tower approaches the 140th anniversary of its construction, it is showing evidence of significant physical deterioration, after many decades of exposure to New England weather.  There is indisputable evidence that the membership of First Baptist was aware that certain aspects of the church needed significant structural repairs, including, in particular, the bell tower.

A report prepared for First Baptist in early 2008 by Meeks, Watson & Company, 13 years prior to the property damage that is the subject of this claim, which was focused primarily on needed repairs to the bell frame and bells in the tower, referred also to "other renovations which may be desired in the tower," and recommended that the "the covering and sealing to the stone walls might be renewed." *Id.*, ¶ 4, Ex. 4.  The exterior walls of the bell tower were repointed back in 1997-98, when the tower was already 110 years old.  First Baptist was also aware, at least as early as 2016, that the church's "[b]ell [t]ower, bell supports, and bells [were] in need of repair." *Id.*, ¶ 5, Exs. 5 and 6.  A Bell Tower Summary dated May 18, 2016, prepared by personnel at First Baptist, distinguished between necessary repairs to the bell tower, on the one hand, and to the bell supports and bells, on the other hand. *Id.*, ¶ 5, Ex. 6.  At that time, First Baptist also acknowledged that it needed to decide if it wanted "to spend about $250,000 to fix the tower." *Id.*, ¶ 6, Ex. 7.

Maintenance of the church structure is performed or directed by First Baptist's Properties Committee. *Id.*, ¶ 7, Ex. 8.  A "Properties Committee Status" report dated September 20, 2017 states, "Bell Tower – no action – on hold." *Id.*, ¶ 8, Ex. 9.  For several years, First Baptist continued to defer necessary repairs to the bell tower.  For example, reports of the Properties Committee in 2018, 2019 and 2020 reiterate that "[r]epair of the bell tower structure and bells is on hold until further notice." *Id.*, ¶ 9, Ex. 10.  Minutes of a First Baptist council meeting held on January 14,

2021, just three months before the subject loss, indicated that, if sufficient money was allocated, First Baptist would "repair the bell tower." *Id.*, ¶ 10, Ex. 11.

On or about April 11, 2021, Steve Loar, a member of First Baptist, discovered that a single piece of cut stone on the exterior face of the north wall of the bell tower had fallen to the ground. *Id.*, ¶ 11, Exs. 12, 13 and 14. Shortly after that incident, David Bliss of Bliss Enclosure Consulting + Design, LLC ["Bliss"] inspected the property on behalf of First Baptist and prepared a written report ["Bliss May 2021 Report"], submitted to First Baptist. *Id.*, ¶ 12, Ex. 8. The Bliss May 2021 Report noted multiple areas of deterioration on the bell tower, including "bulging stone masonry" on the north face, masonry deterioration and efflorescence, moisture-related damage to the roof structure of the north porch, and deteriorated masonry and structural damage to the wooden frame for the carillon bells in the upper portion of the tower. *Id.*, ¶ 12, Ex. 8. Building on Bliss's investigation, in early 2022, another professional consultant, Structures North Consulting Engineers ["Structures North"], performed a more extensive review of the structural integrity of the tower, found numerous defects throughout the interior and exterior of the tower, and concluded in a report dated February 4, 2022 ["Structures North February 2022 Report"], that the bell tower required significant repair work. *Id..*, ¶ 13, Ex. 15. The "Structures North February 2022 Report" concludes,

> Given the extent of damage that we have encountered, it is unfortunately questionable as to whether the tower can actually be restored in place. The outward bulging of the lower north face, the pervasive collar joint failure and exterior leaf deterioration . . . combined with the deterioration of portions of the back-up construction at the interior threatens the present stability of the structure and its ability to be restored.

*Id..*, ¶ 14, Ex. 15.

Just one month later, on March 15, 2022 - approximately one year after the dislodgement of a single stone from the north-facing wall in April 2021 - an additional 25 exterior stones fell

3

from the north face of the tower. *Id.*, ¶ 15, Exs. 12, 13 and 16. Five days later, another 10 stones came loose from the north face of the tower and fell to the ground. *Id.*, ¶ 16, Ex. 12.

On or about April 8, 2022, First Baptist first notified Church Mutual of these events, and advised of its intention to make a claim for property damage under its policy with Church Mutual. *Id.*, ¶ 17, Exs. 17 and 18. In response, Church Mutual issued a reservation of rights letter to First Baptist dated May 17, 2022. *Id.*, ¶ 18, Ex. 17. On or about February 3, 2023, Church Mutual disclaimed coverage under the policy. *Id.*, ¶ 19, Ex. 19. Today, almost four years after the dislodgement of the first stone from the bell tower in April 2021, and almost three years after the second collection of stones came loose in March 2022, the bell tower is still standing in place.

## THE TERMS OF THE POLICY

The Church Mutual Policy at issue here was issued to First Baptist for the policy period February 14, 2021 to February 14, 2022. Included among the coverages provided by the Policy was a Building and Personal Property Coverage Form, which provided coverage to the Insured,

> **. . . for direct physical loss or damage to Covered Property at the premises described in the Declarations Page caused by or resulting from any Covered Cause of Loss.**[1]

Coverage limits under the Property Coverage Part of the Policy are $20,209,000.[2]

The Policy further states that,

1. **When Special is shown in the Declarations Page, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:**

---

[1] *See* Building and Personal Property Coverage Form For Religious Institutions and Related Properties, Form No. A101 (04-06), Section A (COVERAGE), page 1. A copy of the relevant provisions in the Policy is attached hereto as Exhibit "A".

[2] *See* Property Coverage Part Declarations Page"), Form A 001 P (10-99)-MA, page 1 ("ITEM 1. DESCRIPTION OF PREMISES AND COVERAGES: LIMIT OF INSURANCE").

4

4193912_1

       **a.**      **Excluded in Paragraph B., Exclusions . . .[3]**

Among the Exclusions set forth in the Policy are several that have specific relevance to the present matter. The Exclusions part of the Policy states:

**B. EXCLUSIONS**

    . . .

    **2. We will not pay for loss or damage caused by or resulting from any of the following:**

    . . .

    **d.**    **(1)**    **Wear and tear:**

            **(2)**    **Rust, or other corrosion, decay, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself.**

            . . .

            **(4)**    **Settling, cracking, shrinking, or expansion:**

    . . .

    **j.**    **Collapse, except as provided below in the Additional Coverage – Collapse.[4]**

The "ADDITIONAL COVERAGE – COLLAPSE" coverage part of the Policy states:

**D. ADDITIONAL COVERAGE – COLLAPSE**

---

[3] *See* Property Coverage Part Declarations Page, Form A 001 P (10-99)-MA (issued 02/09/21), page 1 ("COVERED CAUSE OF LOSS: ***SPECIAL***") and Common Policy Declarations Page, Form A 001 CD (10-99)-MA (issued 02/09/21), page 1 ("ITEM 5. PROPERTY COVERAGE PART AND ITS FORMS AND ENDORSEMENTS: A127 (04-06) CAUSES OF LOSS – ***SPECIAL*** FORM"); *see also*, CAUSES OF LOSS – ***SPECIAL*** FORM, Form A 127 (04-06), Section A (COVERED CAUSES OF LOSS), ¶1.a. [hereinafter referred to as "Form A 127"](emphasis added).

[4] *See* Form A 127, Section B, ¶¶ 2.d (1), (2), and (4), and 2.j. The Policy contains a number of other exclusions pertaining generally to the physical condition of the insured premises, but none of them is strictly relevant to the present coverage dispute. *Id.*, Section B, ¶¶ 2.a-l and 3.a-c. To the extent it appears that any of those exclusions become relevant in a presently unforeseen way, they will be addressed, with leave of Court, in a Reply Memorandum.

4193912_1

> . . .
>
> 1.  **With respect to buildings:**
>
>     a.  **Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;**
>
>     b.  **A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;**
>
>     c.  **A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;**
>
>     d.  **A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.[5]**

Finally, the Policy's "ADDITIONAL COVERAGE – COLLAPSE" provision includes a critical limitation:

> 2.  **We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form ... if the collapse is caused by one or more of the following:**
>
>     . . .
>
>     b.  **Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse.[6]**

Thus, the coverage issue here may be framed and summarized as follows: Was the damage to the First Baptist bell tower caused by:

- An abrupt falling down or caving in of the tower or any part of the tower;

- Caused by decay that was hidden from view and not known to First Baptist prior to the loss.

---

[5] *See* Form A 127, Section D, ¶¶ 1.a, b, c and d.

[6] *See* Form A 127 (04-06), Section D, ¶ 2.b.

6

## ANALYSIS

***Standard of Review.***  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law", and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Doe v. City of Boston,* Docket No. 21-11062, at p. 8 (D. Mass. Jan. 13. 2025)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Here, as demonstrated above, there is no genuine dispute regarding the occurrence of the property loss for which coverage is sought under the Church Mutual Policy.  In April 2021, a single piece of stone became dislodged from the north face of the First Baptist bell tower, which revealed, upon visual inspection, the existence of significant physical deterioration of the structural integrity of the tower.  As a result, First Baptist now seeks to have Church Mutual fund essentially the complete reconstruction of the bell tower, at a cost of $4.45 million. *See* Newton, Massachusetts Community Preservation Program Funding Request, attached hereto as Exhibit "B".  Those basic facts are uncontested.

Interpretation of a policy of insurance is an issue of law for the court to decide and is appropriately resolved on a motion for summary judgment in the absence of disputed issues of material fact. *Certain Interested Underwriters at Lloyd's, London v. Stolberg,* 680 F.3d 61, 65 (1st Cir. 2012).  The rules of construction for a policy of insurance are the same as those governing any other written contract: the language is construed according to its plain meaning, as applied in the context of the subject matter at issue. *David v. Allstate Ins. Co.,* 434 Mass. 174, 179, 747 N.E. 2d 141 (2001).

> "Like all contracts, the terms of an insurance policy will be construed according to the fair meaning of the language used, as applied to the subject matter." . . . "[A] contract is to be construed to give a reasonable effect to each of its provisions." . . . "[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties."

*Commerce Ins. Co. v. Blackburn*, 81 Mass. App. Ct. 519, 521, 964 N.E.2d 1005, 1007 (2012)(citations omitted). Moreover, "a court should interpret broad contract language so as to avoid absurd results." *Demers Bros. Trucking, Inc. v. Underwriters at Lloyd's, London*, 600 F.Supp.2d 265, 278 (D. Mass. 2009); *see also, Atain Specialty Ins. Co. v. Boston Rickshaw, LLC*, 387 F. Supp. 3d 157, 162 (D. Mass. 2019)(contracts under Massachusetts law are construed to avoid absurd results).

Finally, the "Additional Coverage – Collapse" provision of the Policy is a grant of *coverage* under the Policy, as opposed to an *exclusion* from coverage. Thus, First Baptist, as the *insured*, bears the burden of proving that the property damage claim falls within the Policy's grant of coverage under this provision. *French King Realty, Inc. v. Interstate Fire & Cas. Co.*, 79 Mass. App. Ct. 653, 660, 948 N.E. 2d 1244, 1251 (2011). With those rules of construction in mind, we apply the terms of the instant Policy to the property loss at issue here.

***"Collapse" is Explicitly Defined in the Policy and is Not Ambiguous.*** After initially excluding damage caused by "collapse", the Policy reinserts it in the "Additional Coverage – Collapse" provision of the Policy. To that end, the Policy very explicitly and carefully defines what "collapse" means:

> **Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.**[7]

---

[7] *See* Form A 127, Section D, ¶ 1.a.

8

By any plain understanding of those words, the First Baptist bell tower has not "collapsed". *See, e.g., Builders Mutual Ins. Co. v. GCC Construction, LLC,* Case No. 24-5152/5179, slip op. at p. 9 (6th Cir. Dec. 11, 2024)("[N]o one would look at a wall that's standing upright and say it's collapsed.")[8] Four years after the first stone was observed to have become dislodged from the face of the north wall of the bell tower, the tower is still standing; it has neither "fallen down" nor "caved in". For what it is worth, Church Mutual concedes the obvious: that the stone that fell to the ground in April 2021 almost certainly had to have fallen "abruptly". But as of April 2021, and for almost another year thereafter, no other physical object had come loose and fallen from the tower. Nor, for that matter, has anything come loose and fallen from the tower since March 2022. Neither the north-facing wall, nor the entire tower itself, has "collapsed." *See, Builders Mutual, supra,* slip op. at 2-3, 9-10 (where "a bunch of bricks" fell from a wall, revealing severe underlying structural deterioration of the wall, "that doesn't mean the whole wall collapsed").

***First Baptist Had Prior Knowledge of the Existence of "Decay" in the Bell Tower.*** As set forth above, First Baptist had repointed the exterior walls of the tower in 1997-98 when the tower was already 110 years old, and knew as early as 2008 that repairs to the bell frame and bells in the tower were required, as well as "other renovations which may be desired in the tower," and that the "the covering and sealing to the stone walls might be renewed." SOAF, ¶ 4, Ex. 4. First

---

[8] A copy of the *Builders Mutual* decision may be found on the Sixth Circuit's web site at: 24a0516n-06.pdf. The Court in *Builders Mutual* determined that policy language identical to the definition of "collapse" in the present case was not ambiguous. *Id.,* slip op. at 9. Policy language is not considered to be "ambiguous" simply because a controversy exists as to the language's meaning, with each side favoring an interpretation contrary to the other's. *Aquino v. United Prop. & Cas. Co.,* 403 Mass. 820, 839, 143 N.E.3d 379, 395 (2020). *Builders Mutual* is discussed at greater length at pp. 14-15, *infra.*

Baptist also knew, five years prior to the 2021 dislodgement of the first single stone, that the church's "[b]ell [t]ower, bell supports, and bells [were] in need of repair." *Id.*, ¶ 5, Exs. 5 and 6. Even then, First Baptist acknowledged that a decision needed to be made as to whether "to spend about $250,000 to fix the tower." *Id.*, ¶ 6, Ex. 7. The work, however, was not done, and as of September 2017, the First Baptist Properties Committee noted, "Bell Tower – no action – on hold," *id.*, ¶ 8, Ex. 9, a sentiment that was reiterated for the next three years, up through 2020: "[r]epair of the bell tower structure and bells is on hold until further notice." *Id.*, ¶ 9, Ex. 10. Just three months before the April 2021 incident, notes from the January 14, 2021 First Baptist council meeting stated that, if sufficient money was allocated, First Baptist would "repair the bell tower." *Id.*, ¶ 10, Ex. 11. The repairs, needless to say, were never made.

First Baptist plainly knew that there were significant structural deficiencies in the bell tower prior to April 2021, which defeats its claim for coverage under the Policy. The case of *County of Delaware v. Travelers Property and Casualty Co.*, 559 F. Supp. 3d 425 (E.D. Pa. 2021), a case involving policy terms indistinguishable from those at issue here, is instructive. In July 2018, a precast concrete beam in a County-owned parking garage fell to the floor below as a result of weld failures on steel plates that held the beam in place. Various experts agreed that the welds were deficient at the time of original construction. The garage had to be demolished, and the County sought recovery of over $18 million from its property insurer, on the grounds that the garage had collapsed as a result of decay that was hidden from view which was unknown to the County. *Id.*, 559 F. Supp. 3d at 429-30. The Court entered summary judgment in favor of the insurer.

Five years prior to the collapse, a structural engineering report prepared for the County concluded that there were many concrete and other structural deficiencies throughout the garage,

which remained uncorrected at the time of the collapse. The County sought coverage under the "Abrupt Collapse Additional Coverage" part of the policy on the grounds that it was unaware of decay at the specific location of the failure, even though it had been previously advised that there was "decay" throughout the garage. *Id., supra,* 559 F. Supp. 3d at 436-37. The Court rejected that argument:

> [T]he County cannot meet its burden by simply asserting that it was unaware of the decay at the specific location of the Incident, where it had been repeatedly informed for years by its structural engineering consultant that the same kinds of decay existed throughout the garage. . . . The test is objective – whether a reasonable insured under the same circumstances would have seen or otherwise been aware of the decay. . . . [H]e cannot retreat in willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay.

*Id.,* 559 F. Supp. 3d at 436.

*County of Delaware* is indistinguishable from the present case. First Baptist will claim that it was unaware of the *specific* decay or deterioration that caused the single stone on the north-facing wall of the bell tower to come loose and fall to the ground in April 2021, because that specific decay could not be seen, located behind that stone, before it fell. But the proper test is whether First Baptist was willfully blind to evidence of structural decay throughout the tower prior to April 2021. If it was – and the evidence is uncontestable that it knew and had been repeatedly informed that the tower was in a state of progressive decay for years prior to 2021 – then it cannot establish the lack of knowledge of decay required to trigger coverage under the plain language of the Policy.

**After April 2021, First Baptist Had Actual Knowledge of Decay.** As noted earlier, in the immediate aftermath of the dislodgement of the single stone in April 2021, First Baptist retained the services of Bliss Enclosure Consulting & Design ["Bliss"] to assess the overall condition of the bell tower. Bliss performed at least two site visits in May 2021 and November 2021 and found:

11

- Masonry deterioration at the base of the tower;
- Bulging stone masonry on the north façade of the tower;
- Deteriorated masonry in the upper tower;
- Moisture-related damage, including crumbling mortar, in the interior of the tower;
- Extensive and advanced deterioration of the masonry;
- Deteriorated mortar joints; and
- Multiple large areas of masonry deterioration, including separation of the granite and sandstone façade and the backup masonry.[9]

*See* Bliss Report dated 24 May 2021, SOAF, Ex. 8, and Bliss Report dated 5 February 2022, attached hereto as Exhibit "C".[10] On March 15 and 20, 2022 – *i.e., after* the Bliss Reports were prepared and forwarded to Fist Baptist – two additional batches of stones came loose from the face of the tower and fell to the ground. Here again, it does not matter if First Baptist had no actual knowledge of the existence of mortar deterioration immediately behind or around the specific stones that fell from the face of the north wall in March 2021, as it uncontestably had knowledge of "multiple areas of masonry deterioration", including at the base of the tower, bulging masonry on the north face of the tower, and separation of the exterior and interior layers of masonry, among other structural deficiencies. *See, e.g., 10 E. Washington Ave., LLC v. Amguard Ins. Co.,* C.A. No.

---

[9] Should there be any uncertainty as to whether any of those deficiencies can fairly be characterized as "collapse", the Policy makes it explicitly clear that they cannot:

> **b. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;**
>
> ....
>
> **d. A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.[9]**

*See* Form A 127, Section D, ¶¶ 1.b and d.

[10] Importantly, these observations were noted and recorded by Bliss and communicated to First Baptist *before* the dislodgement of additional pieces of stone in March 2022. *See* pp. 3-4, *infra*.

12

4193912_1

21-15695 (D.N.J. Apr. 22, 2024), a case involving a claim for "collapse" coverage under an identically worded policy of insurance, where a second-floor wall beam in the façade of a building failed, rendering the property unusable:

> Even viewing the facts in a light most favorable to [the insured] such that it may have been unaware of the *specific* decay in the second-floor wall beam that it claims was the cause of the collapse, [the insured] has not refuted . . . [the insurer's] evidence that [the insured] was nonetheless aware of the general condition of the building, even before it purchased the Property, and was made aware of its condition on many occasions thereafter. This triggers the caveat to the "hidden decay" exception: hidden decay is covered *only if* the insured had *no knowledge* of the condition prior to the collapse.

*10 E. Washington Ave., LLC, supra,* slip op. at p. 28 (emphasis in original).[11] Accordingly, it is uncontestable that the two March 2022 incidents cannot be characterized as "collapses", as First

---

[11] A copy of the Court's opinion may be found online at 119121237783. The *E. Washington Ave.* case also provides support for the proposition that the First Baptist bell tower has not "collapsed" within the meaning of the Policy:

> Even if the [2021 Collapse] could be characterized as abrupt or the decay could be characterized as hidden, the Court agrees with [the insurer] that the Additional Coverage for Collapse would still not apply. . . . The Policy provides that the additional coverage does not apply to:
>
>> (a) A building or any part of a building that is in danger of falling down or caving in;
>> (b) A part of a building that is standing, even if it has separated from another part of the building; or
>> (c) A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
>
> The undisputed evidence shows that the Property was still standing at the time of the 2021 Collapse.

*Id.,* slip op. at pp. 28-29 n.20. Here, as described above, the First Baptist bell tower remains standing almost four years after the April 2021 dislodgement of stone.

13

4193912_1

Baptist had actual knowledge prior to that date that there was significant mortar and other structural decay and deterioration in the walls of the tower.

***Even if the April 2021 Incident was a "Collapse", the Damage Resulting From it is Limited to the Cost of Replacing the Single Stone That was Dislodged.*** The *Builders Mutual* case, discussed briefly above, instructs that even if the dislodgement of the single stone in April 2021 were (incorrectly) characterized as a "collapse" within the terms of the Policy, the damages resulting from that event are limited to the cost of replacing the single stone in the wall from which it fell on that occasion. In *Builders Mutual*, a 100-year old brick building was undergoing renovations, which included cutting a new window opening through the building's exterior wall. In doing so, a number of bricks fell from the top of the new opening. Upon examination of the damaged wall, an engineer determined that the interior of the wall showed evidence of severe pre-existing decay and deterioration, had to be demolished, and a new wall erected in its place. *Id.*, slip op. at 2-3. The owner of the building made a claim for property damages in excess of $1 million under a policy containing "collapse" coverage indistinguishable from the Policy at issue here.[12]

> The Court concluded:
>
> [T]he wall remained standing . . . In other words, some bricks fell, yielding a partial collapse under the policy. But that doesn't mean the whole wall collapsed. . . . [and] the falling bricks didn't cause the wall to lose its structural integrity. As the district court's factual findings make clear, the building experienced "very significant deterioration" before [the insured] put the policy in place. . . . [T]he building had "severe unforeseen deterioration only recently uncovered inside the existing West Brick Wall" that made it "not structurally viable to carry the loads of the new renovation." . . . In other words, the window-cutting and resulting brick shower didn't cause structural damage to the property. It only revealed the damage

---

[12] The policy in *Builders Mutual* defined a "collapse" as "an abrupt falling down or caving in of a covered building or structure in whole or in part." It also contained provisions that stated that a structure that was "in danger" of falling down, or that was "standing" was not considered to be in a state of collapse. *Id.*, slip op. at p. 8

14

>to the underlying structure. In plain English, the building was in bad shape long before the collapse occurred.

*Id.,* slip op. at pp. 10, 12. Having found that the building experienced only a "partial collapse", the Court of Appeals (affirming the judgment entered in the court below) concluded that the proper measure of damages was "the cost of repairing the fallen bricks under the policy" – a figure that was presumably less than the $1,079,225 windfall the insured was seeking under its policy to rebuild the entire wall. *Id.,* slip op. at pp. 14, 15.

(Church Mutual emphasizes here that the losses incurred by the insured in *Builders Mutual* and by First Baptist in the present case remain distinguishable. The April 2021 loss of a single stone from the north-facing wall of the bell tower is not a covered loss for "collapse" because the physical deterioration of the bell tower was ***known to First Baptist*** for some considerable time prior to April 2021. In *Builders Mutual,* there was no evidence that the owner/insured had any such prior knowledge.)

***The Life Skills v. Harleysville Case is Distinguishable.*** First Baptist is expected to hold up the recent case of *Life Skills, Inc. v. Harleysville Ins. Co.,* 2024 U.S. Dist. LEXIS 143658 (D. Mass. Aug. 13, 2024), as authority for its position that a covered "collapse" occurred here.[13] But *Life Skills* is distinguishable. First, although the policy language in *Life Skills* is the same as the language in the Policy at issue here, the Court's decision is merely the ***denial*** of a motion for summary judgment brought by the insurer on the principal coverage claim; it is not a decision establishing that a "collapse" did, in fact, occur, or was covered by the policy as a matter of law. *Id.,* slip op. at pp. 15-16.

---

[13] A copy of the slip opinion in *Life Skills* may be found online at: 095112484415.

Second, the principal disputed issue in *Life Skills* was whether an interior floor that had sagged 8-12 inches and had become separated from the exterior wall of the building because the support beams holding it up had severely deteriorated, had "abruptly" collapsed within the meaning of the "Additional Coverage – Collapse" provision of the policy. Harleysville took the position that the failure of the floor had not been "abrupt", and also claimed that it had not fallen down or caved in because it was only "sagging" and had not fallen completely to the ground below; *i.e.,* it was still standing. Life Skills, on the other hand, took the position that the failure of the floor was "abrupt" because it was unexpected, that there was nothing in the policy that specified a minimum vertical displacement in order to qualify as a "collapse", and that it had no prior knowledge of the hidden decay beneath the floor. *Life Skills, supra,* slip op. at pp. 11-12. The Court found both parties' interpretations of the policy to be reasonable, but that the policy language in question did not unequivocally support either party's position. The parties' cross-motions for summary judgment were therefore denied. *Id.,* slip op. at pp. 12, 15-16.

By contrast with Harleysville's position in *Life Skills*, Church Mutual does not dispute that the stones falling from the bell tower wall fell "abruptly" (they did), nor does it dispute that the stones fell all the way to the ground (they did). Reduced to their essentials, the issues here are: (1) Was the April 2021 dislodgement of a single stone a "collapse", given that First Baptist had prior knowledge of structural decay in the bell tower; (2) Were the two March 2022 dislodgements of multiple stones "collapses", given that inspections of the tower post-April 2021 unmistakably revealed extensive evidence of decay in the tower; and (3) Were either of the April 2021 or March 2022 incidents "collapses" when it is uncontested that the 100-foot tall bell tower was left standing, and remains standing to this day, almost four years later? Those issues are essentially legal issues, can be resolved as a matter of law on the current state of the record, and do not require a trial.

16

4193912_1

## CONCLUSION

For the reasons set forth herein, the Defendant's Motion for Summary Judgment should be ALLOWED, and a judgment of non-coverage entered in favor of Church Mutual Insurance Company.

|  |  |
|---|---|
|  | CHURCH MUTUAL INSURANCE COMPANY, S.I.<br>By its Attorneys,<br><br>*/s/ John Egan*<br>John Egan, Esquire BBO # 151670<br>David B. Stanhill, Esq. BBO# 654187<br>Rubin and Rudman LLP<br>53 State Street<br>Boston, MA 02109<br>Tel: (617) 330-7000<br>jegan@rubinrudman.com |
| February 28, 2025 | dstanhill@rubinrudman.com |

## CERTIFICATE OF SERVICE

I, John Egan, hereby certify that on the 28th day of February, 2025, I caused a copy of the within Memorandum of Law in Support of Motion for Summary Judgment to be served electronically to: **Brendan L. Labbe, Blabbe@sloanewalsh.com, Sloane and Walsh, LLP, One Boston Place, 201 Washington Street, Suite 1600, Boston, MA 02108.**

*/s/ John Egan*
John Egan

4193912_1